Good morning. I would like to note that as of last Friday, the name of my firm has changed to Larson & Anderson. I will be sending in the formal papers and my former associate is very happy to be a member. I guess there is some issue in the briefs about what the issue is. I think the issue here is what does 102 mean when it says that the prior art must sufficiently describe the claim invention to have put it in possession of the public. The prior art in this case has a very long list of possibilities. We can skip over a lot of issues simply by saying, yeah, if you are allowed to go in and pick out one of those 1400 and some odd and hold it up next to mine, yep, we are anticipated. And yes, you can take that list of letters and go down to the Cornirologo store, pay your hundred and some odd bucks and they will send you back a jar of the stuff. So it is enabled. I am a little confused by this. Turning to the language in Claim 1, doesn't it just disclose an oligo quote of sufficient length to act as an antisense inhibitor? I am not seeing where the language requires that the oligo actually acts as an antisense inhibitor. No, it doesn't. What it does require is that it have this structure that is aligned to both IGFBP2 and IGFBP5 in the same sequence. And there are only limited numbers of places within the sequences that do that. And we have identified, we think, all of them. But if you are not claiming that they actually act as an antisense inhibitor, then I don't understand. Your argument, as I understood it, is you have got these 1400 and there is no way that someone would necessarily know to pick and choose to get you to what your client is claiming. And I guess if what you are claiming does not require an antisense inhibitor, then why not? Well, my issue is that this is an anticipation rejection and then that automatic obviousness rejection that says it is okay if we have a very long list that has no guidance to any properties within that. Let me make a very simple example. But what guidance would you need? Well, let me do my example and I think then it goes from there. Let's say that I have an inventor who invents a thingamajig. And the thingamajig that my inventor creates is special because it has five gizmos as part of it. That's in the claim, five gizmos. And this is partly to show that this really has nothing to do with biotech. It's not so limited. I have a first reference that says thingamajig with one or more gizmos. Well, that reference by itself doesn't anticipate five because it doesn't say five. And my inventor there would be able to come in and show that five was special among this genus of thingamajigs with gizmos. I have a second patent attorney who comes in and he says at least one. For example, one, two, three, four, five, six, seven, eight, and he goes on for ten pages. Now there's good reasons he might do that. Hey, if he can't get at least one, maybe he can get at least two or at least three or three to 150. He can pick any numbers he wants. It probably wasn't actually his client's invention, but it gets around the world of written description problems. What if it says five or more? Five or more, then five's got a problem. But it doesn't. It says one or more. A genus and a list have been treated differently under anticipation cases by our court. A genus can be an open-ended kind of thing and a list is a concrete number. And I understand what you're saying from a policy perspective. You'd like us to say when a list gets long enough, you ought to treat them the same. No, I'm not even saying when a list gets long enough. I'm saying when a list provides no more information to the public than the generic statement would. And that's what we have here. I don't understand. You're claiming the sequence. No, I'm claiming very small specific parts of the overall sequence. If I said here, take the sequence of IGFBP2. Did your client file a method of use claim? We have that pending. And that is separate and distinct from a claim to the sequence. It seems that a method of use, if you have come up with a novel, non-obvious use, is the way to go. I mean, this happens all the time in pharmaceuticals or compound claims where someone comes up for a new and different use for a compound that's already disclosed somewhere and they get a use patent. But they can't necessarily get a patent on the compound themselves, even if they're the one to come up with the best possible use of it. They still don't get the compound. It's already in the public's possession. But let's take the pharmaceutical case where we have the center structure and 10 R groups, each one of which lists a few thousand choices by the time we parse them out. And we have millions of compounds that are dominated by that claim. No question about it. But if I go and I pick out this one, this one, this one, and this one, and I find that that compound has special and unique properties, that compound is not anticipated by that generic disclosure. So if I want that compound to be anticipated, now I'm going to, instead of doing that, after I make that compound, I'm going to set out thousands and thousands of pages of tables in which I list all the possible combinations. I put R1 as this, and I list all the other combinations. But compounds run into enablement problems that DNA sequences do not. That's why those lists of compounds would never be successful as anticipatory references. But DNA sequences, by your own admission, don't have that problem. You can go down to your vending machine for Oreos, as your example pointed out, and pay your $100, and boom, out spits your substance. Except that the disclosure didn't put the art, the public, in possession of my client's invention. Right, because your client's invention is the use of this thing. It's not the thing itself. The world is in possession of the thing itself. But it's not the use. I mean, but your invention is not the use, right? Well, that's not in this case. In this case, it is the composition. No, no, her claims are the composition, but her invention is the use, because the claims themselves exist in prior art references. But the structure here is not, it is a case where the substantive disclosure, what's there, what information is provided to the public, depends not on the information provided to the public, because that same information is there in the short form. If I simply say, make some 15 base complementary sequence, all of that is there in that sequence. The sequence was already known. If I say, before this reference, it did its word processing effort. If I simply say, make a 15 base sequence that is complementary, and you could use it as an antisense or a probe or anything else, I have given the public exactly the same information that is in here. I just used a lot less ink to do it. I guess I'm not understanding this argument that you're making. I thought that I understood your case to be really a dispute with Rasmussen and some of our prior precedent that says, for enablement purposes, all you have to show is how to make. You don't have to show how to use. I thought I understood your argument to be primarily, it's not fair in these DNA sequence tests or DNA cases that you ought to have to show both somehow. Am I missing, is that not the crux of your argument? No, it's more a matter of that it shouldn't matter, that what should be important is the ability to place into the prior art possession of my invention, and that you shouldn't be able to go running through long, long lists, say, aha, there's your invention, I found it, when nothing about the way the prior art is disclosed would make that one come out as anything. Why not? Because it means, one of my examples... Do you disagree with the fact that our anticipation law says that if the composition, or in this case the sequence, or whatever the invention is claimed, is actually disclosed in a prior art reference and there is enablement, one of skill in the art would know how to make it, then it is anticipatory. Do you disagree with that as a statement of our law? I disagree that it is contrary to public policy to say that when in fact the way, the nature of the prior disclosure didn't actually give the public the benefit of that. I'm confused. For example... We've got a body of precedent, and we don't have the option of ignoring it, and our anticipation case law seems to me to be crystal clear. If the thing is disclosed, and one of skill in the art would know how to make it, then it's anticipated. But the statute doesn't say disclosed, it says described in a manner that would place it in... And the case law says described in a way that would put it in possession of the public. And if we apply the same standards to described and possession of the public for 102 that we do for written description, I don't think I'd be allowed to claim this from that patent, from just a long list. I haven't disclosed anything. I have not provided any information, and I don't think I should be. Well, you haven't provided a utility. But we have case law that specifically says that's not necessary. Actually, I don't even... I would say you do have a utility. You could always use it as a probe. The issue is, do I give anything to the art by the semantic manner in which I write the words out? If I take a... I had an example in the brief below. But counsel, an anticipatory reference doesn't have to have qualified for a patent in order to be used as an anticipatory reference. An anticipatory reference, our case law is quite clear, doesn't need to rise to the level of disclosure that would actually allow the author to secure his own patent rights if he were to so proceed. That's why the standard for anticipatory references are less than the standard for patentability. But if... I had an example in the briefs below that I didn't repeat in here. If I had... I sometimes write science fiction stories that never get published. If I chose to do one about a biotech sequence, and I decided just to be really cute that I would have the peptide sequence that it encoded be the word general, and it's a very general purpose peptide, that's why I chose the name. It does everything. And then I backtracked and I coded that, and I wrote that in my science fiction novel. Is it enabled? You bet. Do I have a utility? Probably not. Because it probably doesn't, in fact, encode a general purpose peptide. Is it anticipatory? Under your standard, yes, it is. Should it be? I don't think so. But I did not contribute anything to the art. Do you want to save any time for rebuttal? Yes, Your Honor. Thank you. Ms. Kelly? Good morning, Your Honors. May it please the Court. Gleave, as you're aware, admits that Wright discloses six oligonucleotides falling within the scope of its claims. Ms. Larson just stood here and acknowledged that... But I'm having a little trouble, and maybe it's my problem and not yours, but for now it's yours. So the question I have is, how would you have known to pick these six oligos that are in Wright, that are transferred to Gleave? And you say you seem to rely on an inherency argument. Yes. How would one skill in the art know that these particular six have the ability to block the gene expression? The same way that Gleave knew. Well, first of all, Wright's disclosure is not as blank and empty as Gleave would have you believe. Wright says, look, these sequences can be used as antisense oligonucleotides to block the expression of IgFbp2. In his specification, Wright also says, and by the way, my molecules may also be bispecific and may bind to and block the expression of IgFbp2, 3, 4, 5. Because these sequences are similar, you would expect regions of overlap. But the problem I have with that is you're basing your position on the fact that we've identified six out of these 1,400. Mm-hmm. That work in Gleave. How would one have known? I mean, Wright doesn't say, and these six do this. He says some of these may be possible of being bispecific. Well, the sequences of both of those genes were already known in the prior art for more than a decade. What if ordinary skill in the art would do exactly what Gleave did, which is just take a computer, and what the examiner did, by the way, just take a computer, line them all up, see where there's a region of overlap, and that's where these six alpha-nucleotides come out. That's what Gleave did. That's what, you know, Wright did. That's what anybody else did. They went and saw people that originally identified those genes. They're sitting in a computer. You could just line them up and see where they overlap. And then you just pick out those sequences right in the middle of the overlap. And, you know, yes, you know, we understand the point that, you know, Gleave's attempting to make, that somehow that just seems wrong, that it's so easy. But, in fact, it is, and what... It is easy. That's just the nature of the art. And what this means for the future is not some parade of horribles where people will start writing books and putting letter codes in there that will, you know, invalidate future patents to proteins and genes. What it means is that the first person to identify a new novel gene, that person is going to be entitled to compounds that will act as, in a sense, oligonucleotides to that gene. And future people like... future inventors like Gleave, when they come along, will be entitled, if they find a new and non-obvious use, will be entitled to method claims. So there's no parade of horribles. What this just simply means is that people who come up with new methods will be entitled to method claims. And the original people to identify new genes, they'll get the, in a sense, oligonucleotides to those genes. The inventors in this case didn't, you know, seek those sorts of claims. The people who originally identified the IGFBP2 and 5 gene didn't do that in this case, probably because they identified those genes 1990 or prior, and people weren't doing, in a sense, technology then. Do you agree with Judge Moore's observation that our case law is crystal clear, that there's no use requirement in an anticipatory reference? I do believe that the case law does state that, but in this case... But don't we have cases that also include... that state that there is a use reference? You do have cases that say make and use, but Gleave never challenged... If you believe that that's the way the case law reads... Well, I mean, it either says it or it doesn't, and I think you agree with me that there are cases that say make and use. But we have that in this case. What case does make and use? You're talking about impacts? Impacts says make and use, and resmusin says make and use, but both of those cases are method cases. I would think the PTO's difference would be exactly what you just got to, which is the only way to show an ailment of a method is to show how to use it, as opposed to a composition. Is that how you would possibly distinguish these two? That's exactly where I was headed, is that those cases, resmusin and impacts, those are method cases, and in those cases we're talking about using a compound to treat a disease, and so we really need to know how to pick that compound and then take that to treat a disease. In the case of impacts... I may be wrong about this, but it strikes me resmusin involves a method claim, but the statement that says there's no use requirement is resmusin. Resmusin talks about a practical utility. Resmusin says that when you're talking with 112, and I'm quoting, that's the term used in resmusin, practical utility, it just means that those of ordinary skill and art would know how to take that item and use it in the way those of ordinary skill and art think of it, but it's not utility... Is there a difference between use and utility? Utility under 101, as this Court has defined it, means something that's specific, substantial, credible, and use as it's used in enablement for 112 purposes means practical use. If you're a person working in art, you know how to take it and then use it. In general parlance, again, practical utility is how the Court defines it in resmusin. That's not that higher standard for 101 of specific, substantial, and credible. But just to answer that sort of concern that you appear to be having about utility, the PTO would argue that in this case we have something more than we had in the Fisher case, a case that Gleave would argue is similar to this case where you just have this whole list of nucleic acids and nobody knows what to do with them and nobody knows how to choose from them. We don't have that case where we have a bunch of DNA sequences that are part of a gene that we don't know what the gene does and we don't know what those DNA sequences would do. In this case, we know that these antisense molecules will bind to a particular gene. And we know that they're to be used as antisense oligonucleotides because Wright says antisense oligonucleotides to IGFP2 may be selected from the molecules capable of interacting with one or more of the following oligonucleotides. So just one point I want to make sure I understand. Are you now arguing that even if a use is required, you think that Wright meets the enablement requirement by disclosing the use? Is that what you're arguing? I'm just trying to understand. I'm just trying to clarify for Judge Prost that yes, that we believe that a use exists, a practical utility exists in this case. However, we believe that under this court's precedence, in a compound case, we don't need that for anticipation. But in a methods case, we would need that for anticipation. But in any event, there's no reversible error under either standard. What do we do with Wiggins? Boy, that's a real hornet's nest. Well, I would argue, the PTO argues that Wiggins, what the statement in Wiggins was dicta, because this court said in Donahue that Wiggins was decided on the fact that in contrast to being silent about the ability to make this particular compound, Wiggins, the claims in that case, were defeated because the prior attempted to make the compound and had failed. There was an express statement that they had failed. And I would not disagree with this court's characterization of the Wiggins decision. But that would hinge on enablement, right? I mean, how is it that in the Wiggins court there was a failure for anticipation purposes? Was it because the disclosure wasn't sufficient or because it wasn't enabling because it said they weren't able to produce it? Well, the way that this court characterized it in Donahue was rather than being silent about whether they tried it or not, whether someone could synthesize it or not, they actually said, hey, we tried to synthesize this and it didn't work. That's the way that this court characterized it in Donahue. Does that go to enablement or disclosure of it, though? Enablement, I would say. I know, but the Wiggins, look, I'm with you. I understand your pain. But the Wiggins case says explicitly, I'm now quoting from the case, Gutticelli is an enabling disclosure since Donison's process could be used to make the name compounds, thereby putting them in possession of the public. I understand how we characterize Wiggins, and I understand why you're relying on it, but I don't know what to do with that sentence because that sentence says to me that the court found enablement, so it must have found a flaw in something else. I understand the difficulty that you're having because it's a difficulty that language exists in Wiggins. This court has chosen to view the Wiggins decision differently in Ray Donahue, and I think that's the correct decision. And if you look at later decisions of this court, for example, we cite the Perricone case. If you look at these later decisions, they have backed away from those strong statements in Wiggins, and implicitly, I would say, overruling those statements in Wiggins. Are there any more questions from the panel? Thank you. Ms. Larson, rebuttal. Two minutes. Just briefly on the utility issue, while Example 6 of the reference says that molecules capable of interacting as antisense may be selected, and we do have antisense in our claim as a requirement, there's no suggestion that all of these are going to work as antisense. Evidence of record is that they are not all going to work. The Stein reference, which is attached, suggests that about one out of eight that people try after doing some selection to get the ones that they think might work, actually work as antisense. We also have the double dip that normally when you select antisense, you want it to only target one protein. You don't want it to target multiple proteins. So you would, if we were in an obvious regime, we have numerous arguments to say you wouldn't pick these if you did a study of every possible one. But we can't make those arguments because we are in anticipation. Our guys didn't go out and take a couple molecules and test them. They had to study this completely and make an invention. So it took experimentation. It took experimentation. So you disagree with the inherency part of what the PTO argues was disclosed? Well, if I'm allowed to go in here and say, ooh, I want that one because it matches the sequence in my reference, yeah, I have no case. I can't compare that one to mine because it would really be an unexpected result if comparing two things that were identical came up with a different result. But this doesn't give anything to the art. I can write a computer program in a very few lines that would generate all possible 15-mers. It would take a lot of paper, but I wouldn't print it out. I'd put it on the Internet. And it's a very, very easy program to write. And now nobody gets a 15-mer or anything close to it because they've got anticipation problems. And that is a parade of horrors. It means that somebody who's opposed to the idea of patenting DNA takes a little more paper but no longer a program to make 16, 17, 18. And I think that you have to look at what prior art really puts into the possession of the public without them having to do any more experimentation with them going to be able to look at it and say, ooh, that one. That's the one I want. And not look at the semantics, the way it's laid out on the paper. All right, thank you. The appeal is submitted.